SQUIRES v. PARKER et al.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1900.)

No. 728.

1. COLLISION—STEAM AND SAIL VESSELS—PRESUMPTION OF FAULT.
Under navigation rules 20 and 23 (Rev. St. § 4233), which make it the duty of a steam vessel to keep out of the way of a sail vessel, when they are proceeding in such directions as to involve risk of collision, and the duty of the latter to keep her course, where a collision occurs between a steam and a sail vessel, and it is shown that the latter kept her course, the presumption arises that the steam vessel was in fault, and such presumption must form the basis of the judgment in a suit for the collision, unless it is made clearly to appear that the accident was inevitable.

2. SAME—RIGHT TO DISREGARD RULES.
While a steamship may disregard the statutory rules for the prevention of collision, where she cannot obey them without placing herself in serious peril she is bound to resort to all other practicable means before she is justified in doing so.

3. SAME.
A steamer has no right to call upon a sail vessel to change her course, where she can, by herself taking the proper course, avoid collision, and the failure of the sail vessel to obey such signal cannot be imputed to her as a fault, especially where it does not appear that it would have lessened the danger of collision.

Appeal from the District Court of the United States for the Eastern District of Michigan.

The libel in this case was filed for the purpose of recovering damages ensuing upon a collision which took place in the early morning of the 20th, of September, 1888, between the libelant's schooner, the Owasco, and the claimant's steamship, the Minneapolis, just below the mouth of the Detroit river, where it opens into the lake. The Owasco had, during the night before, been brought down in a tow, of which she was the rearward vessel, by a tug. At the time when the tow passed out of the river into the waters below it encountered a heavy wind from the southwest, and the Georgia, a vessel ahead of the Owasco, grounded. The line from the Owasco was thrown off, and she thereupon set about getting her sails up, with the intention of proceeding on her voyage to Toledo, to which port she was bound. This was about 3 o'clock in the morning. The weather was clear, though it was yet dark. The schooner was well over to the east of the course ordinarily taken by vessels of deep draught in coming down out of the river, but was in water navigable for vessels of her class. She had started on her course on a port tack, and was heading W. by N., ½ N., close to the wind. Her foresail, staysail, jib, and flying jib were set, and the crew were endeavoring to get up the mainsail. As she was moving across she saw, coming down the river, the steamer Minneapolis, with a barge in tow. The steamer was then on the easterly side of the channel, heading

nearly in the direction of the position of the Owasco, and about one-half mile distant from her. At about the same time the green light of the latter was seen from the steamer. The course and conduct of the vessels from this time on, as was gathered from the proof by this court on the appeal, were substantially as follows: The Owasco kept her course, though she was carried a little to leeward by the strong wind from the southwest. The captain of the steamer testified that he saw no change in the schooner's course. The steamer, intending to pass under the stern of the schooner, kept along down on the easterly side of the channel until about halfway to the point where she would cross the Owasco's course, and then touched bottom. Thereupon the steamer made a sharp turn to the westward, and went across the channel, a distance of about 550 yards, to the west side, blowing three passing signals of one blast on her way. On reaching the western bank, she grounded, and almost immediately after that the Owasco struck her at an angle of about 45 deg., the schooner having been turned a little to the right, just before the collision, to ease the blow. The schooner and the steamer were in sight of each other continuously after they were first sighted, respectively. Those on the Minneapolis assumed that the Owasco was bound up the river. Damage resulted from the collision to the schooner, and the libel is filed to recover therefor. Upon the hearing in the district court on pleadings and proofs, the libel was dismissed.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

SEVERENS, Circuit Judge, having stated the case as above, delivered the opinion of the court.

The learned district judge did not file an opinion in disposing of this case, and we have not, therefore, the advantage of knowing on what grounds he rested his decision. Upon an attentive review of the record, we are constrained to a different conclusion. By rule 20, prescribed by section 4233 of the Revised Statutes, it is declared that "if two vessels, one of which is a sail vessel and the other a steam vessel, are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sail vessel"; and by rule 23 that, when one of two vessels is required to "keep out of her way, the other shall keep her course, subject to the qualifications of rule 24." Where, as here, a collision has occurred in the condition stated, between a sail vessel and a steam vessel, and the sail vessel is shown to have kept her course, a presumption at once arises that it resulted from the failure of the steamship to keep out of the way of the other. And this presumption must form the basis of the judgment, unless it shall be made clearly to appear that the accident was inevitable. The following among many other cases will show how constantly this presumption has been upheld and enforced: The Carroll, 8 Wall. 302, 19 L. Ed. 392; The Fannie, 11 Wall. 238, 20 L. Ed. 114; The Scotia, 14 Wall. 170, 20 L. Ed. 822; Farr v. The Farnley (D. C.) 1 Fed. 631; The Hercules, Id. 925; The Badger State (D. C.) 8 Fed. 526; The Pennland (D. C.) 23 Fed. 551; The Seneca (D. C.) 47 Fed. 87.

There does not appear to have been any fault on the part of the steamer directly contributing to the collision until the time when she touched bottom on the eastern side of the channel. Up to that time her purpose was to pass the schooner on her starboard hand, and her course, barring that she kept too near the edge of the channel, seems to have been correct, and according to her duty, and, if there

had been no radical departure from it, she would have passed fairly behind the schooner, and the accident would not have occurred. But at this time she took a sudden and inexplicable turn to starboard, and went directly across the bow of the schooner, and so brought on the collision, which was the probable result of her course. We say that the course of the steamer was inexplicable; for it was an unreasonable proceeding upon her own assumption that the schooner was intending to go up the river. She knew the duty of the schooner, and she saw that the latter was pursuing it, and there was fair opportunity for both to get on safely by proceeding in faithful observance of the rules. The water way was ample to the westward of the steamer's course, even if the schooner had been intending to do what the steamer assumed. The blowing of the signal to pass the steamer by the port side was an invitation to danger. Besides, as was said in the case of MaGuire v. The Sylvan Glen (D. C.) 2 Fed. 905, 910, where there was a similar situation, "the steamer had no right to call on the sailing vessel to give way or to change her course." It seems to us entirely clear that there was nothing in the circumstances approaching the character of an inevitable accident to relieve the steamer from blame. We concede that, as urged by counsel for the respondent, the governing rule is modified when the steamer cannot obey it without getting into serious peril and there is no other way to avoid it but to disregard the rule. The Marguerite (D. C.) 87 Fed. 953. But in such case it is obvious that the steamer is bound to resort to all other practicable means before she can be justified in violating the statutory regulation.

There is a suggestion in the brief of counsel for the appellees that the steamer was in a "crippled condition," and that on that account there was a duty on the part of the schooner to accommodate herself to the condition of the steamer. But there is nothing in the proofs to lead one to the conclusion that the steamer was not entirely manageable, and certainly there is nothing to show that it was easier for her to run her erratic course than it would have been to have followed on down the channel under the stern of the schooner. We have referred to the fact that those on the steamer supposed the schooner was going up the river, and have considered how the case would stand if it were admitted that the steamer had the right to take that for granted. But it would not be permissible to concede that the steamer had the right to assume as a certain fact that such was the intention of the schooner. Such was not, in fact, her intention. She was endeavoring to get on her way in the other direction, and was taking appropriate measures to do so. That which she was intending to do was equally as consistent with her conduct as that which was imputed to her, and in such a situation it was the duty of the steamer to delay final action until a clear understanding of the intention of the schooner could be had. The Falcon, 19 Wall. 75, 22 L. Ed. 98; The Iron Chief, 22 U. S. App. 473, 11 C. C. A. 196, 63 Fed. 289.

It is further urged that, if the proposition made by the signal blast of the steamer was not acceptable to the schooner, she "should have

displayed a danger signal (a torch)." But, as we have said, there was nothing in the circumstances to give the right to call the schooner from her course and duty, and it is more than doubtful if the acceptance of the proposition would not have been as full of danger as the adhering of the schooner to her course. Besides, all the conditions were evident, and the indications of peril, not only of the existing situation, but also of the course proposed, were as manifest as if the schooner had expressly declared it. Nor do we think that the giving of such a signal would have affected the conduct of the steamer. And in such circumstances there is no fault in omitting the super-serviceable act. The Hercules (D. C.) 1 Fed. 925; The Pennland (D. C.) 23 Fed. 551. These views lead to the conclusion that the decree of the district court should be reversed, with costs, and the case remanded, with directions to enter a decree for the libelant and an assessment of damages. It is so ordered.