## THE RICHMOND.

(District Court, E. D. Virginia. February 19, 1902.)

1. COLLISION—STEAM AND SAILING VESSELS—PRESUMPTION OF FAULT.

Under the navigation rules requiring a steam vessel to keep out of the way of a sailing vessel when there is risk of collision, and requiring the latter to keep her course and speed, where it appears that she did so, a presumption arises that the fault for a collision was that of the steam vessel, and such presumption must be acted upon unless the accident is shown to have been inevitable, or that it was the result of neglect or omission on the part of those navigating the other vessel.

2. SAME—MAINTENANCE OF LIGHTS—EVIDENCE.

The failure of those in charge of one of two vessels to see or observe the lights of the other prior to collision does not disprove their existence; and cannot be accepted to outweigh the positive testimony of the officers and crew of the other vessel that the lights were properly set, and were seen to be burning up to within five minutes before the collision.

3. SAME—EX PARTE EXPERIMENTS.

Testimony in regard to experiments to determine the position of a vessel's lights, and whether they could have been seen by the officers

and crew as claimed, when the vessel was in a shattered condition from a collision, or after she had been rebuilt and materially changed, is not entitled to great weight, especially where the experiments were made by the adverse party without notice to the owners or crew, and when they were not present.

**4. SAME.**

Where it is shown that a vessel was equipped with lamps of an approved style, bought from a reputable dealer, the court will be slow to find that they were inefficient, or that those navigating the vessel failed to light and keep them burning on a dark and stormy night, when they were sailing in a locality where there was a probability of encountering other vessels.

**5. SAME.**

The claim of a steamer that a collision with a schooner was due to the failure of the latter to carry proper lights is materially weakened by the fact that such omission was not mentioned in the steamer's log, nor in the protest lodged against the schooner on the following day.

**6. SAME—STEAMER AND SCHOONER CROSSING.**

Evidence considered, and *held* to establish the claim that a collision between a steamer and a schooner in Chesapeake Bay on a stormy night was due solely to the fault of the steamer in failing to maintain an efficient lookout, or to reduce speed after lights were reported two or three miles off the port bow, until the location and course of the vessel carrying such lights could be ascertained, as well as because of improper maneuvers after the schooner was seen when 1,000 feet away, which were in themselves calculated to bring on a collision.

In Admiralty. Libel in rem to recover damages for collision.

This is a libel to recover damages caused by a collision between the steamship Richmond and the Georgie Clark, a three-masted schooner. The collision occurred on the night of January 31, 1899, about three miles E. S. E. of Thimble Light, in Chesapeake Bay, between 9:30 and 9:50 p. m. The steamship was on its outward trip to New York, having left Norfolk about 7 p. m. The schooner was also bound from Norfolk to New York, with a cargo of lumber; but after passing out of the capes had, on account of the threatening condition of the weather, to put about for harbor, and at the time of collision was bound into Hampton Roads for anchorage. The tide was flood. The night was dark and cloudy, with passing rain and snow squalls, but lights could be seen a considerable distance. The wind was about N. N. E., increasing, and the schooner had her three lower sails and three head sails set. She had a crew of seven men, consisting of the captain, mate, four sailors, and a steward. She passed in the capes about 7 p. m., bearing southward, some four miles distant from Cape Henry. Her course was about west, until, in the neighborhood of 9 o'clock, finding that she was getting too far to the southward, she made a short port tack to the N. E., continuing on this tack 15 or 20 minutes, when she was put back on her starboard tack, heading W. by N., and continued on that course until in collision. The schooner was making between five and six miles an hour, and the steamer, on a course E. S. E. from Thimble Light, some 9½ miles an hour. The vessels came together by the bow of the schooner coming in contact with the after part of the midship house of the steamer on her port side, about 70 feet from her stern, doing some injury to the joiner work of the steering gear to the steamer. The forward portion of the schooner was wrecked, the bow burst open and carried away, and it left in a disabled condition. The charges of fault in the libel are that the steamer failed to keep out of the way of the schooner, slacken her speed, stop or reverse, or to take any other precautions necessary and prescribed to avoid a collision, and that the collision was caused entirely and exclusively by the fault and negligence of the steamer's navigators. The charges of negligence against the schooner are: Unskillfulness on the part of those in charge of her navigation; the failure to have and maintain lawful lights, properly set and burn-

114 F.—14

ing; and that the schooner was proceeding at too rapid a rate of speed, and improperly changed her course.

Whitehurst & Hughes, for libelant.
Hughes & Little, for respondent.

WADDILL, District Judge (after stating the facts). The collision in this case being between a sailing vessel and a steamship, reference may be had to the rules of navigation properly applicable, with a view of ascertaining if they have been violated, and by whom. Article 20 of the rules of navigation is as follows: "When a steam vessel and a sail vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sail vessel." Article 21 is as follows: "Where, by any of these rules, one of two vessels is to keep out of the way, the other shall keep her course and speed." Upon its appearing that the sailing vessel in collision kept its course, a presumption at once arises that the accident resulted from the failure of the steamship to keep out of its way, and this presumption should be acted upon, unless the accident is shown to have been inevitable, or that the same was the result of neglect or omission on the part of those navigating such vessel. The Carroll, 8 Wall. 302, 19 L. Ed. 392; The Fannie, 11 Wall. 238, 20 L. Ed. 114; The Scotia, 14 Wall. 170, 20 L. Ed. 822; Squires v. Parker, 42 C. C. A. 51, 101 Fed. 843; Spencer, Mar. Coll. 222, 223. There is no suggestion in this case of any inevitable accident, and the evidence, as viewed by the court, quite clearly establishes the fact that there was no change of course by the vessel at the time of collision, as it also does that the vessel was not proceeding at an undue rate of speed, or that its navigators failed properly to discharge their duty.

The only fault alleged against the schooner seriously contended for is that at the time of the collision its lights were not up and properly set and burning. As to this a great deal of evidence was taken, which, in part, it will be necessary to review. Four officers of the steamship were examined, viz., the master, the first officer, quartermaster, and lookout. Of this number, only two testified as to seeing the vessel and not observing the light, viz., the first officer and the master. The former observed the vessel when about a thousand feet away; the other, the master, did not see it until practically in collision, he having about that time come into the pilot house. Against this evidence we have the positive statement from four of the officers and crew of the vessel that the green light was burning. Clark, the mate, who made special examination, testified that twice within 40 minutes of the vessels' coming together he saw the lights in place, and properly burning, and that by the shock of the collision they were knocked out of their sockets and put out. Lund, the lookout, testified that he was in a position to see the lights, and actually observed them within five minutes of the collision. Watson, one of the mate's men, who was called out to assist in making the port tack, within 40 minutes of the accident, testified to seeing both the port and starboard lights burning; and Bartlett, the master, who was at the wheel, testified that he saw the glimmer of the green light on the jib when

the schooner was on the port tack. The steward, Peterson, testified that he trimmed and put them up in good order, and that Lund, the lookout, reported that they were burning 5 or 10 minutes before the collision.

This positive testimony by those on the schooner, in a position to see the lights, and know of their condition, will not be lightly rejected because other persons, whose duty it was to have seen them, either failed to observe, or happened not to see them. Negative evidence of this character cannot be accepted to outweigh positive evidence. The failure to observe a light cannot be said to disprove its existence. Stitt v. Huidekopers, 17 Wall. 384, 21 L. Ed. 644; The Thingvalla, 1 C. C. A. 87, 48 Fed. 764; The Michigan, 11 C. C. A. 187, 63 Fed. 280; The Alice B. Phillips, 26 C. C. A. 467, 81 Fed. 415; Green v. Compagnia Generale, 42 C. C. A. 580, 102 Fed. 650.

Effort was made to elucidate this important question, of whether or not the lights of the schooner were burning, and, if burning, were sufficient, and could have been seen from the positions from which the several witnesses on the vessel claim to have seen them,—the contention being that as these lights were fastened to an iron standard or stanchion extending from the rail of the vessel, and not in the rigging, they were improperly placed, and could not have been seen, and that the lamps were without proper ventilation and reflectors; and with this end in view, shortly after the collision, while the vessel was in the harbor at Norfolk, certain officers of the steamship company and others went at night upon and examined the vessel, and experimented with the same, from its forecastle deck, in its then shattered condition, and the conclusion was that the lights could not have been seen as testified to by the vessel's master and crew. Subsequently, hoping to refute the testimony as to this experimental examination, the libelant, after the vessel had been repaired, had examinations made of it in the city of Philadelphia, and made experiments also, as far as they could be then had; the vessel having been materially changed in rebuilding.

As to all of this testimony, it may be said, in passing, that it is hearsay in character, purely speculative, and entitled to but little weight; and especially is this true of that secured by the steamship's representative when the vessel was in dock after the collision. No notice was given of the proposed experiments to the other parties in interest or their counsel. They were denied any opportunity to know as to the exact condition of affairs when the experiment was made, and, indeed, what was done and seen. At least notice ought to have been given, and an opportunity afforded those to be affected to be present, before such testimony should be considered. The R. R. Kirkland (D. C.) 48 Fed. 760.

To the experiment made in Philadelphia by the libelant, possibly more weight should be given, if any, as opportunity was afforded the other party to be affected to be present if he desired. But, at best, all such evidence, by reason of the necessarily changed conditions and surroundings existing at the time of the particular occurrence, ought to be received with the greatest caution, if at all. The evidence taken by the libelant as to the character of the lights, and

their position upon the schooner, of persons not in the collision, who were familiar with the schooner prior to the time of the collision, and who testified that the arrangement of the lights on the stanchion instead of in the rigging was preferable, and that such lights could be seen on the schooner from the screen box on the stanchion, is entitled and ought to receive the weight due to evidence of any other persons who knew of the existence of particular facts and testified to them.

The court should be slow to hold that the officers and crew of a vessel were navigating the same without lights, as by so doing they were imperiling, not only the ship and its cargo, but their own lives (The Gate City [D. C.] 90 Fed. 314–317); and, for like reason, the lamps upon the vessel should not be quickly condemned, as it is not probable that the vessel owner would have used an inefficient appliance of this importance to the existence of his property, at least intentionally. The evidence taken in Philadelphia by the libelants is to the effect that the Flick light, used in the test there made, could be seen more than two miles distant on that night, which was more favorable for seeing than the night of the collision; and it is admitted that the light taken from the schooner was a Flick light, of satisfactory size, with corrugated glass of the proper dimensions, and bought from a ship chandler in Philadelphia who had been in the business 30 years. In the case of The Olympia (D. C.) 52 Fed. 991, it was held that one can rely upon an article as being reliable for its purpose when bought from a reputable ship chandler.

A most significant circumstance, bearing upon the vessel's lights, is the fact that, although the failure of the vessel in this regard is made the chief basis of the steamer's defense, the fact that such lights did not exist was not made record of at the time of the collision, either in the steamer's log or the protest made the next day. Both the log and the protest utterly fail to make any reference to such conditions, and it is hard to believe that so important an omission would have been made had the lights not been burning. Nothing could have been more material to the steamer,—nothing would so likely have accounted for the collision, and probably have vindicated the steamer. The Utopia (D. C.) 1 Fed. 892; The Frostburg (D. C.) 25 Fed. 451. The object of keeping the log was to have a record made at the time of the then existing facts. The Newfoundland (D. C.) 89 Fed. 510–515. Congress by act of the 14th of February, 1900, amending section 4290 of the Revised Statutes, has specifically required the facts of collision to be set forth in the log. This significant conduct on the part of the steamer, together with the other facts and circumstances in the case, convince me that the schooner's lights were properly set and burning at the time of the collision.

In two particulars, at least, is the negligence of the steamer established from the evidence, as viewed by the court:

First. The failure to have a proper lookout, or the neglect of the one employed properly to discharge his duty. The steamer's lookout testified that shortly after passing Thimble Light a red light was reported several miles distant on the port bow of the steamer, and, although the hull and spars of a vessel could be seen a half a mile

away, he neither saw the vessel in collision with his ship, nor its lights, until they were within 300 feet of each other, and then not until his attention was called by the screams of persons aboard of the schooner, when, without reporting the schooner, he immediately left his station. Had this lookout been competent, or in the proper discharge of his duty, the schooner could easily have been seen and reported, with or without lights, according to his own statement, in time to avoid the collision. The Ariadne, 13 Wall. 475, 478, 20 L. Ed. 542; The Oregon, 158 U. S. 186, 193, 15 Sup. Ct. 804, 39 L. Ed. 943; The Manhasset (D. C.) 34 Fed. 408; The Samuel Dillaway, 38 C. C. A. 675, 98 Fed. 138; Steamship Co. v. Low (C. C. A.) 112 Fed. 161, 172.

Second. The first officer of the steamer having observed the hull of the schooner in collision 1,000 feet off, and the schooner's masts 300 feet off the steamer's port bow, should have immediately ported his helm, and gone full speed ahead, or have hard ported and reversed. To have slowed down under one bell, and starboarded, was to do the two things most likely to bring about the collision, as, it seems quite demonstrable, it did in this case. To starboard with a green light off of the port bow, or the starboard side of a vessel without lights off of the port bow, was manifestly an improper maneuver, and could be only justified where the collision was so imminent that the coming together of the two vessels would be lightened, possibly, by so doing.

The Richmond, a propeller, would have responded much more readily to its port than its starboard helm, particularly with the then condition of the wind and tide; and had this course been pursued, as clearly contemplated by the rules of navigation (articles 21 and 22), this collision would, in all human probability, have been averted. The Farnley (C. C.) 8 Fed. 629; The Excelsior (D. C.) 102 Fed. 652.

Moreover, it may be said that the steamer, having had reported a red light on its port bow, a distance of two or three miles away, should, under the circumstances, have done more than itself port one point, and proceed at full speed. It was a bad night, and the vessel, while apparently not across its course, was still reported ahead, and the steamer should have slackened her speed until its exact location was ascertained. The fact that the vessels did collide quite disposes of the contention that there was no risk of the collision at that time, as does the circumstance of the steamer's porting strongly indicate that there was apprehension of this collision. A possibility of collision is all that is requisite to charge the steamer, unless it can establish that it was free from fault. The Carroll, 8 Wall. 302, 305, 19 L. Ed. 392; Hoben v. The Westover (D. C.) 2 Fed. 91; Steamship Co. v. Low (C. C. A.) 112 Fed. 161, 166, 171.

In the recent case of The New York, 175 U. S. 187, 207, 20 Sup. Ct. 67, 75, 44 L. Ed. 126, the supreme court said:

"The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn; but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect."

The disappearance of the light itself was a warning to the steamer, at least, sufficient to make it exercise extraordinary diligence, which it seems not to have done. Indeed, although the lookout could have seen the schooner's lights two miles away, and the vessel itself a half mile away, he admits that he saw neither until his attention was attracted by the screams of those on the vessel. This is equivalent to a confession of his own negligence.

A decree may be entered holding the steamer solely responsible for the collision.