## THE CAPTAIN SAM.

(District Court, S. D. Alabama.    March 6, 1902.)

**1. COLLISION—SUIT FOR DAMAGES—EVIDENCE.**

The testimony of officers and witnesses as to what was actually done on board their own vessels is entitled to greater weight than that of witnesses who form their opinions merely from observation.

**2. SAME—NEGLIGENT TOWING—LENGTH OF LINE.**

It is not negligent under all circumstances for a tug to tow a vessel with a great length of line; and, to render her liable for a collision on that ground, it must be shown that it resulted from such cause.

**3. SAME—SIGNAL ON LEAVING BERTH.**
Under pilot rule 3, requiring boats when **moved from their docks or** berths, and other boats are liable to pass from any direction toward them, to give a signal, a tug should give such signal on taking a tow from its berth; but the failure to do so will not render her liable for a subsequent collision between the tow and another vessel, where the latter saw the tug at the slip, and knew she was taking out a tow.

**4. SAME—TUG WITH TOW AND FREE BERTH.**
As between a tug with a heavy tow and an overtaking tug without any tow, the duty is imposed on the latter to keep out of the way.

**5. SAME—TUG OVERTAKING TOW—FAILURE TO KEEP LOOKOUT.**
The tug Captain Sam, on a clear morning, took a large and heavily laden barge from her slip in Mobile, and started up the river against a strong wind and current. At the time she took the barge out, the tug Hero was further down stream, also coming up the river. Both tugs proceeded up stream, the Hero for some time gaining, until she had passed the barge, when she, in some manner, was struck by the barge and injured. The weight of evidence showed that the barge was following directly in the course of her tug on a line which had been run out to a length of about 250 feet, and that, after passing, the Hero went on a course diagonally crossing that of the tug and tow, although there was plenty of room in the channel to keep away. The Hero had no lookout, and did not see the barge until immediately before the collision. *Held*, that the Captain Sam was not in fault, but that the collision resulted from the fault of the Hero, whose duty it was to see and watch the tug and tow, and to keep out of their way.

In Admiralty. Suit for collision.

Smith & Gaynor, for A. J. Stone
R. H. & N. R. Clarke, for J. B. Stiggins.
Pillans, Hanaw & Pillans, for the tug Sam.

TOULMIN, District Judge. These are libels for collision, by A. J. Stone, the master and pilot of the steam tug Hero, and J. B. Stiggins, the owner of said tug, against the steam tug Captain Sam. The collision happened near the middle of Mobile river, opposite the north side of the Mobile & Ohio Railroad wharf, in the city of Mobile, shortly after 7 o'clock in the morning of January 20, 1900, between the barge Jerry, in tow of the Captain Sam on a hawser, and the tug Hero. Both tugs were bound up the river. The Hero was damaged, and her said master and pilot was thrown into the water and greatly injured.

The negligence charged is that the towline of the Captain Sam was too long for the proper management and control of the tow, and that the barge was pulled by the Captain Sam from her berth at the dock with so long a line and at such great speed that it swung therefrom, quartering across the river below the Hero, turned in behind her, and struck her on her port quarter some 7 or 8 feet from the stern; and that the Captain Sam, on leaving the slip at the dock with the barge, negligently failed to give a signal by blowing her whistle as required by rule 8 of the pilot rules. The evidence, without conflict, is that the morning was bright and clear; that there was a strong north wind blowing, and a strong current in the river; that the tug Captain Sam left the dock in the lower part of the city, and came up to what is known as the elevator slip, where she took

in tow the barge Jerry, loaded with about 55,000 feet of timber and lumber; that the Jerry is a very large barge; she was rigged with steering appliances, and had a captain or steersman aboard of her. There were several other men on board, who were stevedores going up the river to load a vessel with said timber and lumber; that the Hero left her berth in a slip some 800 yards below the elevator slip a little before 7 o'clock; that the Captain Sam had preceded her up the river, and when the Hero got out of the slip of her berth the Captain Sam was near by, and opposite the elevator slip, and in the act of taking the barge in tow. The Hero headed northeastwardly, and went out in or near the middle of the river; that the river from the Mobile & Ohio Railroad wharf to the east line of the channel is 950 feet. A. J. Stone testified that when he got out of the slip he looked up the river and saw the Captain Sam lying quartering up the river, and apparently about 30 yards from the elevator wharf or slip; and, seeing that she was going to pull a vessel out, he went out in the middle of the river, and headed north; that when he reached a point about opposite to the Captain Sam she passed ahead, and about 30 yards to the westward, and proceeded up the river; that he never did get abreast of her; that she ran off from him and left him in the rear; that he did not see the barge or any towline; that the first time he saw the barge was when the fireman on the Hero called out to him to "look out for the barge." He looked out through the window of the pilot house, and saw the barge 15 or 20 feet from, and a little below, him, coming quartering towards the Hero's stern. He did not see the towline, but said he "did not notice particularly"; that when he saw the barge he put the wheel of the Hero to starboard and the helm to port, but it did not have much effect,—the barge was then too close. When the barge struck the Hero the Captain Sam was going straight up the river, and nearly 100 yards ahead of him,—at least 250 feet,—and a little to the westward of him; she appeared to be going at full speed; that the Captain Sam blew no whistle when she came out with her tow, and the Hero blew no whistle as she proceeded up the river behind the Captain Sam, and had no lookout. He further testified that it was the custom to blow a whistle when leaving the dock with or without a tow, as required by the rule. Horace Samuels also testified, for the libelants, that he was the fireman on the Hero; that when he first saw the barge, just before the collision, it was coming towards the Hero on the port side in an angling direction, and was about 10 feet of the Hero; that his attention was called to the barge by hearing some one laughing, and he looked out and saw her as stated. He was in the hole of the boat, putting in coal, and had been down there ever since he left the wharf, except when he came on deck one time to straighten out a rope; that the Captain Sam was about 100 yards from the Hero at the time of the collision, and that the tow line was taut; that when he first saw the Captain Sam going out in the stream she was about 150 yards from the Hero, and that before the collision happened she was in 60 or 75 yards of her. It appears that the Hero had a crew of three men,—pilot, fireman, and engineer. The pilot and fireman testified substantially as hereinabove stated. The engineer

unfortunately lost his life in the disaster. A number of other witnesses testified, both for the libelants and the claimants, some of whom were on shore, and witnessed the collision and circumstances connected with it, and some were aboard the Captain Sam, and on the barge Jerry.

The decided weight of the evidence is that the towline was comparatively a short one when passed to the barge,—not more than 30 or 35 feet long,—but was gradually let out until it was perhaps 250 feet long, though there was some discrepancy in the testimony on this point; that when the Captain Sam stopped to take the tow she occupied a very few minutes in doing so; that the barge was ready to be taken up, and the Captain Sam halted in the stream, hardly coming to a dead stop. There is a want of harmony in the testimony as to whether the barge was entirely out of the slip when the line was passed to it, or whether it was only partly out. Some of the witnesses—even some who aided in moving the barge out—said it was entirely out of the slip and in the stream, while others said it was only partly out of the slip, and that the tug passed the line to it and pulled her clear of the slip. However, they all substantially agreed in saying that a very short time was consumed by the tug in getting the tow and going ahead, and that it went out in the stream, quartering or angling in a northeasterly direction, and with a little swing or sheer by the barge, and that the tug went off slowly, and did not quite reach the middle of the river when she headed north, and the barge straightened up behind her, and was so following her at the time of the collision; that the Captain Sam had not attained full speed when the collision occurred, but was going faster than she was when she started out with the tow. The weight of the evidence, further, is that the Hero was farther down the river than the Captain Sam when the latter left the elevator slip, and was about 150 yards southeastwardly from her; that the Hero was making more speed than the Captain Sam up to a few minutes before the collision. The Hero was unencumbered, while the Captain Sam was encumbered with a heavy tow going against a strong current and north wind; that for some few minutes before the collision the Hero was abreast of the barge to the eastward of her, and approaching on a line intersecting the course of the barge, and had gotten partly ahead of the barge, bearing northwestwardly across her course, when the collision happened. The weight of the evidence also is that the manner in which the barge was being towed was a proper, and the customary, manner. The Captain Sam was a much larger, more powerful, and faster boat than the Hero. The captain of the barge and others on board of her with him, who testified, stated that he was at the helm, steering the barge, from the time they left the slip up to the time of the collision, and that she was straight behind the Captain Sam when the collision happened. There is some other testimony, which tends to show he was not steering at the time; but it is of a negative character. Furthermore, "the established rule is that the testimony of officers and witnesses as to what was actually done on board their own vessels is entitled to greater weight than of witnesses * * * who judge or form opinions merely from observation." The Havana

(D. C.) 54 Fed. 413; The Alexander Folsom, 3 C. C. A. 165, 52 Fed. 411.

It is negligence for a tug to tow a vessel on a hawser that is so long that it is unmanageable and liable to sudden sheer. The theory of the libelants' case is based on this rule. But the facts of the case as developed by the evidence do not sustain their theory. "It is not negligent under all circumstances for a tug to tow a vessel with a great length of line. To render her liable, it must be shown by a fair preponderance of proof that the collision resulted from such dangerous length of line." Spenc. Mar. Coll. § 128; The Ashford (D. C.) 44 Fed. 703. I find that the preponderance of proof is the contrary.

"As between a steamer and a tug with a heavy tow, the tug and tow are to be treated as a sailing vessel, and the duty of avoiding them is imposed on the steamer." Spenc. Mar. Coll. § 123, and authorities cited in note. "The rule gives the right of way to a sailing vessel as against a steamer, and requires the steamer to keep off the course of the sailing vessel if it is practically possible to do so." The Marguerite (D. C.) 87 Fed. 953.

The evidence shows that there was ample room in the river to the eastward of the Captain Sam and her tow for the Hero to have kept out of their course. Moreover, the Hero was the overtaking vessel, and it was her duty as such to keep out of the way of the Captain Sam and her tow. 1 Supp. Rev. St. p. 787, arts. 24, 25; The Sylvan Grove (D. C.) 29 Fed. 336; Spenc. Mar. Coll. § 69. That the Hero was the overtaking vessel is clearly shown by the testimony of the witness Horace Samuels, the fireman on the Hero. He stated that when he saw the Captain Sam with the barge going out in the stream the Hero was 150 yards southeastwardly of her, and that before the collision occurred she was in 60 or 75 yards of her. His testimony, which is corroborated by other evidence in the case, establishes several material facts, namely: That the Hero was the overtaking vessel; that she was running faster than the Captain Sam, at least up to a few minutes before the collision occurred; that she had gained on the Captain Sam the difference between 150 yards and 60 or 75 yards before that time; and that when the Hero was 150 yards, say 450 feet, of the Captain Sam she was a greater distance from the Captain Sam than the barge was by 150 to 200 feet. It was the duty of the Hero to see the Captain Sam with her tow as soon as she could be seen, to watch her progress and direction, to take into account all the circumstances of the situation, and so govern herself as to guard against peril to either. The Falcon, 19 Wall. 75, 22 L. Ed. 98; The Carroll, 8 Wall. 302, 19 L. Ed. 392. And the Hero should have had a lookout, and especially was it her duty, knowing that the Captain Sam was in the river, and when first seen by the master and pilot of the Hero at or near the elevator slip was in the act of taking a tow.

I think the fact that the barge and tow line were not seen is sufficient to impute negligence to the Hero. Her failure to have a lookout was a direct violation of the regulations, and it may be fairly presumed that if she had been properly manned in this respect the accident would have been avoided. Pilot rule 8 provides that:

"When boats are moved from their docks or berths, and other boats are liable to pass from any direction toward them, they shall give the same signal as in case of boats meeting at a bend," etc.

The Captain Sam gave no signal at the time she left the elevator slip with her tow. She was not leaving her dock or berth. Her situation and movements did not bring her within the letter of the rule. But it may be said that she was within the spirit and purpose of the rule, which required her to give notice to other boats liable to pass that she was in motion. The Captain Sam was taking a tow. The barge to be towed was in a berth, and being brought out from it. Some of the evidence, as I have said, is that the barge was only partly out of the slip when the towline was passed to it, and that it was pulled out by the tug. Conceding this to be true, and that the tug and its tow should be treated as one vessel under the circumstances, I think the Captain Sam should have complied with rule 8. But her failure to do so does not, in my opinion, affect this case. She was plainly seen by the pilot of the Hero. He saw her steam up to the point where she temporarily stopped to take the tow. He saw her lying in the stream a short distance from the slip, and saw she was going to pull a vessel out. So he required no signal to give him notice that she was in motion or about to move. And there is no reason to believe from the evidence that the failure to give a signal had any relation to the collision, or caused, or could have caused, it. My judgment is that the libelants are not entitled to recover, and that the libels must be dismissed, at the libelants' cost.

The claim of Kate Y. Baker, as administratrix, being based on the same facts, as far as a right to recover for the collision is concerned, is also dismissed.